FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

2005 MAY -6 1 A 10: 31

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.

Case No.:  3:05-cr- 129- J-99 mcr
Ct. 1:      18 U.S.C. § 371

HEIDI L. WEPPELMAN

### INFORMATION

The United States Attorney charges:

### COUNT ONE

### A. INTRODUCTION

At all times material herein, unless otherwise specified:

### THE DEFENDANT

1.      HEIDI L. WEPPELMAN, was a resident of Jacksonville, Florida, and was a self-employed licensed mortgage broker.

### BACKGROUND

2.      Monarch Mortgage and the Processing Post were two businesses owned by the defendant and co-conspirator Tamera K. Kinsman.  Monarch Mortgage was located in Jacksonville, Florida, and operated as a residential mortgage company.  The Processing Post was a business operated by the defendant and other co-conspirators which processed financial information associated with client residential loan applications.

3.      A HUD - 1 Settlement Statement is a United States Department of Housing and Urban Development form which is universally used in closings of

residential properties in the United States.  A HUD - 1 is used to identify and allocate the various expenses associated with the sale of residential real estate between the buyer and the seller of the property.

4.     A Uniform Residential Loan Application, commonly referred to as a mortgage loan application or a Form 1003, is a universally used mortgage application developed by federal government agencies, and is utilized by financial institutions in the mortgage loan approval process.  The Form 1003 requires the buyer/borrower to submit his/her financial history, including employment information, monthly income, assets and liabilities, and the specific details of the residential real estate transaction.

5.     Mortgage companies facilitate the mortgage loan process by assembling information and documentation used by financial institutions in connection with lending financial institutions' loan approval process for residential real estate loans.  Mortgage companies are tasked with ensuring that the information set forth on Forms 1003 is true, correct and free of any misrepresentation, procuring property appraisals, securing verification of employment letters, and if necessary, securing escrow letters reflecting that the buyer/borrower has deposited the necessary funds into an escrow account to close the real estate sale transaction.

6.     Purchase and Sale Agreements are written contracts used in the sale of real estate and set forth the terms of the real estate transaction, including identifying the property to be sold, the seller of the property, the buyer of the property, the purchase price, and other conditions of the sale.

7.     A property appraisal is an estimate of the value of real estate and is used by lending financial institutions when determining the amount of the loan or mortgage that will be extended on real estate.

8.     A loan-to-value ratio (LTV) is the ratio between a mortgage loan and the market or appraised value of real estate.  LTV is used as a standard to measure the borrower's vested interest in the property and his/her willingness to repay the loan.  The higher the LTV, the more money that a financial institution loans on a specific piece of real estate.

9.     The term closing is used in the real estate industry to refer to the legal transfer of real estate from seller to buyer.

## B.  CHARGE

From at least 2001, and continuing thereafter until July, 2004, at Jacksonville, in the Middle District of Florida, and elsewhere,

HEIDI L. WEPPELMAN,

the defendant herein, along with others known and unknown, did conspire to commit the following offenses:

1.     to use the United States mails and cause the use of the United States mails in furtherance of a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses and representations, in violation of Title 18, United States Code, Sections 1341 and 2;

2.     to devise and intend to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343;

3

3.      to knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution and to obtain money, funds, credits, assets, or other property owned by, or under the custody or control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344;

4.      to conduct, and attempt to conduct, financial transactions affecting interstate commerce that involved the proceeds of specified unlawful activities, to wit: mail fraud, in violation of 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States Code, Section 1343; and bank fraud, in violation of Title 18, United States Code, Section 1344, knowing that the monies involved in the financial transactions represented the proceeds of some form of unlawful activity, (1) with the intent to promote the carrying on of specified unlawful activity, and (2) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i)and 1956(a)(1)(B)(i); and

5.      to knowingly engage, and attempt to engage, in monetary transactions affecting interstate commerce, that occurred in the United States and involved criminally derived property of a value greater than $10, 000 that was derived from specified unlawful activity, to wit: mail fraud, in violation of 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States Code, Section 1343; bank fraud,  in violation of Title 18, United States Code, Section 1344, in violation of Title 18, United States Code, Section 1957(a).

## C. MANNER AND MEANS

1.      It was part of the conspiracy that a co-conspirator, JR Parker, would,
using real estate brokers/agents, identify residential real estate (properties) for
purchase.

2.      It was further part of the conspiracy that JR Parker would direct real estate
brokers/agents to negotiate the purchase of properties from owners/sellers and
formalize the agreement in written contracts, using various alleged trusts, on behalf of
JR Parker.

3.      It was further part of the conspiracy that JR Parker would have associates
solicit individuals to attend investor recruitment meetings held by JR Parker.

4.      It was further part of the conspiracy that JR Parker would hold investor
recruitment meetings in order to solicit individuals to act as residential real estate
investors (investors).

5.      It was further part of the conspiracy that JR Parker would refer to his
real estate investment scheme as his "Program."

6.      It was further part of the conspiracy that JR Parker would solicit
potential investors to participate in his (Parker's) "Program" by advising potential
investors that they would not be required to pay any closing costs or fees when
purchasing properties under his "Program."

7.      It was further part of the conspiracy that JR Parker would solicit potential
investors to participate in his (Parker's) "Program" by advising potential investors that
they would initially purchase up to four (4) properties, and receive $2,500 at closing for
the first two properties and $5,000 at closing for the next two properties.

8.      It was further part of the conspiracy that JR Parker would have potential investors provide basic personal background information at the conclusion of JR Parker's investor recruitment meetings.

9.      It was further part of the conspiracy that Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease, employees of Monarch Mortgage and the Processing Post, would work with JR Parker to fraudulently process and originate loan applications for investors.

10.      It was further part of the conspiracy that Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease, would, at the direction of JR Parker, create false and fictitious financial information pertaining to the investor/borrowers' income and asset portfolio, in order to mislead financial institutions in connection with the financial institutions' mortgage loan approval process.

11.      It was further part of the conspiracy that a licensed residential real estate appraiser would appraise properties used in JR Parker's "Program" by significantly inflating the value of the properties.

12.      It was further part of the conspiracy that Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease would obtain false and fraudulent verification of employment (VOE) documentation from a Jacksonville attorney's law office, in order to mislead financial institutions in connection with financial institutions' mortgage loan approval process.

13.      It was further part of the conspiracy that Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease would obtain false and fraudulent verification of rent (VOR) documentation from a Jacksonville business so as to further mislead

6

financial institutions in connection with financial institutions' mortgage loan approval process.

14.    It was further part of the conspiracy that Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease would obtain, from a Jacksonville attorney's law office, false and fraudulent escrow letters, purporting to represent that certain monies had been provided to the Jacksonville attorney by investors/buyers, when no such monies had been provided to the Jacksonville attorney by the investor/buyers, so as to mislead financial institutions in connection with the financial institutions' mortgage loan approval process.

15.    It was further part of the conspiracy that JR Parker, along with Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease, would forge signatures of sellers and buyers (investors/borrowers) of residential real estate.

16.    It was further part of the conspiracy that Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease would obtain mortgage loans with high loan-to-value ratios, up to 90%, so that conspirators could share in the difference between the actual purchase price of the property and the amount of the mortgage loan, said mortgage loan being based upon an inflated appraisal on the property.

17.    It was further part of the conspiracy that Dale A. Beardsley would be the closing attorney for the properties purchased by investors in JR Parker's "Program."

18.    It was further part of the conspiracy that Dale A. Beardsley would direct his paralegal to prepare two HUD - 1 closing statements for each property purchased by investors in JR Parker's "Program."

19.    It was further part of the conspiracy that Dale A. Beardsley would direct

his paralegal to fraudulently represent on one of the HUD - 1s, which was created to effectuate the sale of the property from the seller, referred to by JR Parker as the cash HUD - 1, that the property was being purchased by the investor/borrower for the amount set forth on the written contract negotiated by the real estate brokers/agents on behalf of JR Parker.

20.    It was further part of the conspiracy that Dale A. Beardsley would direct his paralegal to fraudulently represent on the second HUD - 1, referred to by JR Parker as the mortgage HUD - 1, which was created to effectuate the fraudulent acquisition of the mortgage proceeds for the same property purchased using the cash HUD - 1, that the property was being purchased by the investor/borrower for the amount of the inflated appraisal.

21.    It was further part of the conspiracy that Dale A. Beardsley would provide JR Parker with a check from his law firm's Real Estate Trust Account , for the exact amount of monies that the investor/borrower was allegedly bringing to closing, that is, the difference between the mortgage loan amount and the alleged sale price of property.

22.    It was further part of the conspiracy that JR Parker would negotiate the check from Dale A. Beardsley's Real Estate Trust Account, and obtain an official bank check in the same amount of Dale A. Beardsley's Real Estate Trust Account check to JR Parker.

23.    It was further part of the conspiracy that JR Parker would bring the official bank check obtained from negotiating the Dale A. Beardsley's Real Estate Trust Account check to the closing at Dale A. Beardsley's law office, enabling the conspirators to mislead financial institutions into believing that the source of the down

payment for the property was the investor/borrower, when in truth and fact, the source of the down payment was Dale A. Beardsley.

24.     It was further part of the conspiracy that Dale A. Beardsley would hold separate closings for the seller of the property and the investor/borrower.

25.     It was further part of the conspiracy that the closing for the investor/borrower would take place prior to the closing held for the seller of the property.

26.     It was further part of the conspiracy that conspirators would forge closing documentation at the law office of Dale A. Beardsley, in order to mislead the seller, the investor/borrower, and the financial institution.

27.     It was further part of the conspiracy that Dale A. Beardsley would charge more than $1,000 as legal fees for each closing on the same piece of property, totaling more than $2,000.

28.      It was further part of the conspiracy that Dale A. Beardsley, through his paralegal, would disburse the funds obtained from the financial institution making the mortgage loan, by issuing checks from his law firm's account, with the majority of the fraudulently obtained funds available after paying the seller of the property, being paid to JR Parker.

29.     It was further part of the conspiracy that JR Parker would pay approximately $4,000 to his (JR Parker's) associates for each investor/borrower they solicited to attend investor recruitment meetings held by JR Parker and by participating in his "Program," by actually purchasing a property.

30.     It was further part of the conspiracy that JR Parker would pay $500 to Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease for securing financing for properties purchased by investor/borrowers and culminated in a completed closing.

31.     It was further part of the conspiracy that conspirators would attempt to close at least five (5) properties in JR Parker's "Program" weekly.

32.     It was further part of the conspiracy that JR Parker would personally profit at least $10,000 for each property purchased by an investor/borrower and closed by Dale A. Beardsley.

33.     It was further part of the conspiracy that the conspirators would take any and all actions necessary to hide and conceal the existence of the conspiracy.

## D. OVERT ACTS

In furtherance of the conspiracy and to affect the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida and elsewhere:

1.     In or about June, 2001, in connection with an investor/borrower's purchase of residential real estate located at 204 East 43rd Street, Jacksonville, Florida, through JR Parker's real estate investment "Program," a false and fraudulent escrow letter was created, purporting to represent that $3,150 had been provided to a Jacksonville, Florida, lawyer by the buyer of 204 East 43rd Street, Jacksonville, Florida, when no such money had been provided by the buyer.

2.     In or about June, 2004, a Jacksonville, Florida, real estate broker identified a property at 460 Summer Drive, Jacksonville, Florida, to be used in JR Parker's  real estate investment "Program."

3.     In or about June, 2004, a Jacksonville, Florida, real estate broker negotiated a Purchase and Sale Agreement for residential real estate at 460 Summer Drive, Jacksonville, Florida, between the seller and Central Florida Trust, an alleged trust used by JR Parker.

4.      In or about June, 2004, a Jacksonville, Florida, real estate broker identified a property at 1524 Pasco Street, Jacksonville, Florida, to be used in JR Parker's  real estate investment "Program."

5.      In or about June, 2004, a Jacksonville, Florida,  real estate broker negotiated a Purchase and Sale Agreement for residential real estate at 1524 Pasco Street, Jacksonville, Florida, between the seller and Central Florida Trust, an alleged trust used by JR Parker.

6.      In or about April, 2004, a Jacksonville, Florida, real estate broker identified a property at 141 West 21st Street, Jacksonville, Florida, to be used in JR Parker's  real estate investment "Program."

7.      In or about April, 2004, a Jacksonville, Florida, real estate broker negotiated a Purchase and Sale Agreement for residential real estate at 141 West 21st Street, Jacksonville, Florida, between the seller and Traders Trust, an alleged trust used by JR Parker.

8.      In or about the first quarter of 2004, JR Parker solicited individuals to purchase residential real estate using his (JR Parker's) "Program," by conducting an investor recruitment meeting at an attorney's office in Jacksonville, Florida.

9.      On or about August 5, 2004, JR Parker solicited individuals to purchase residential real estate using his (JR Parker's) "Program," by conducting an investor recruitment meeting at an attorney's office in Jacksonville, Florida.

10.     On or about August 5, 2004, during an investor recruitment meeting held at an attorney's office in Jacksonville, Florida, JR Parker advised potential investors that they would not be required to pay closing costs or fees when purchasing properties under his "Program."

11.     On or about August 5, 2004, during an investor recruitment meeting held at an attorney's office in Jacksonville, Florida, JR Parker advised potential investors that they would initially purchase up to four (4) properties and receive $2,500 at the closing for the first two properties and $5,000 at the closing for the next two properties.

12.     From in or about November through December, 2002, in connection with JR Parker's real estate investment "Program," a Jacksonville, Florida, Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease processed and originated an investor/borrower's mortgage loan application in connection with the purchase of residential real estate located at 1353 Bridier Street, Jacksonville, Florida.

13.     In or about November, 2002, in connection with an investor/borrower's purchase of residential real estate located at 1353 Bridier Street, Jacksonville, Florida, through JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease created and included on a Form 1003 mortgage loan application, false and fictitious financial information pertaining to the investor/borrower's salary, employment and asset portfolio, specifically, that the investor/borrower was employed by and received a salary from a Jacksonville, Florida, attorney, as a private investigator, and had $36,589 on deposit with Bank of America.

14.     In or about December, 2002, in connection with the closing of residential real estate located at 1353 Bridier Street, Jacksonville, Florida, Dale A. Beardsley directed his paralegal to prepare two HUD - 1s, one (1) HUD -1 to effectuate the sale of the property from the seller, and one (1) HUD - 1 to effectuate the fraudulent acquisition of mortgage funds by the conspirators.

15.     In or about December, 2002, in connection with the closing of residential real estate located at 1353 Bridier Street, Jacksonville, Florida, conspirators forged signatures on closing documents at the law office of Dale A. Beardsley.

16.     From in or about October through November, 2003, in connection with JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease processed and originated an investor/borrower's mortgage loan application in connection with the purchase of residential real estate located at 1538 Pasco Street, Jacksonville, Florida.

17.     In or about October, 2003, in connection with an investor/borrower's purchase of residential real estate located at 1538 Pasco Street, Jacksonville, Florida, through JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease created and included on a Form 1003 mortgage loan application, false and fictitious financial information pertaining to the investor/borrower's asset portfolio, specifically, that the investor/borrower had $35,689 on deposit with Bank of America.

18.     In or about November, 2003, in connection with the closing of residential real estate located at 1538 Pasco Street, Jacksonville, Florida, Dale A. Beardsley directed his paralegal to prepare two HUD - 1s, one (1) HUD -1 to effectuate the sale of the property from the seller, and one (1) HUD - 1 to effectuate the fraudulent acquisition of mortgage funds by the conspirators.

19.     In or about November, 2003, in connection with the closing of residential real estate located at 1538 Pasco Street, Jacksonville, Florida, conspirators forged signatures on closing documents at the law office of Dale A. Beardsley.

20.     In or about November, 2003, in connection with JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease processed and originated an investor/borrower's mortgage loan application in connection with the purchase of residential real estate located at 925 West 29th Street, Jacksonville, Florida.

21.     In or about November, 2003, in connection with an investor/borrower's purchase of residential real estate located at 925 West 29th Street, Jacksonville, Florida, through JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease created and included on a Form 1003 mortgage loan application, false and fictitious financial information pertaining to the investor/borrower's asset portfolio, specifically, that the investor/borrower had $35,689 on deposit with Bank of America.

22.     From in or about February through March, 2004, in connection with JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease processed and originated an investor/borrower's mortgage loan application in connection with the purchase of residential real estate located at 2116 Baldwin Street, Jacksonville, Florida.

23.     In or about February, 2004, in connection with an investor/borrower's purchase of residential real estate located at 2116 Baldwin Street, Jacksonville, Florida, through JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease created and included on a Form 1003 mortgage loan application, false and fictitious financial information pertaining to the investor/borrower's  asset portfolio, specifically, that the investor/borrower had $20,104 on deposit with Bank of America.

24.     In or about March, 2004, in connection with the closing of residential real estate located at 2116 Baldwin Street, Jacksonville, Florida, Dale A. Beardsley directed his paralegal to prepare two HUD - 1s, one (1) HUD -1 to effectuate the sale of the property from the seller, and one (1) HUD - 1 to effectuate the fraudulent acquisition of mortgage funds by the conspirators.

25.     On or about March 17, 2004, in connection with the closing of residential real estate located at 2116 Baldwin Street, Jacksonville, Florida, JR Parker received a check, number 15641, in the amount of $12,770.48, drawn on the Real Estate Trust Account for Dale A. Beardsley, P.A., at First Guaranty Bank & Trust Company, representing his share of the fraudulently obtained mortgage funds from People's Choice Home Loan, Inc.

26.     From in or about January through March, 2004, in connection with JR Parker's real estate investment "Program,"Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease processed and originated an investor/borrower's mortgage loan application in connection with the purchase of residential real estate located at 675 Stanwick Road, Jacksonville, Florida.

27.     In or about January, 2004, in connection with an investor/borrower's purchase of residential real estate located at 675 Stanwick Road, Jacksonville, Florida, through JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease created and included on a Form 1003 mortgage loan application, false and fictitious financial information pertaining to the investor/borrower's asset portfolio, specifically, that the investor/borrower had $28,965 on deposit with Bank of America.

28.    In or about August, 2004, in connection with JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease processed and originated an investor/borrower's mortgage loan application in connection with the purchase of residential real estate located at 3125 Franklin Street, Jacksonville, Florida.

29.    In or about August, 2004, in connection with an investor/borrower's purchase of residential real estate located at 3125 Franklin Street, Jacksonville, Florida, through JR Parker's real estate investment "Program," Tamera K. Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease created and included on a Form 1003 mortgage loan application, false and fictitious financial information pertaining to the investor/borrower's asset portfolio, specifically, that the investor/borrower had $16,500 on deposit with Bank of America.

30.    In or about August, 2004, in connection with the purchase of residential real estate located at 134 East 15th Street, Jacksonville, Florida, JR Parker forged the signature of the seller of the residential real estate on an Agreement to Sell Real Estate contract.

31.    In or about August, 2004, in connection with the purchase of residential real estate located at 460 Summer Street, Jacksonville, Florida, JR Parker forged the signature of the buyer and seller of the residential real estate on an Agreement to Sell Real Estate contract.

32.    In or about August, 2004, in connection with the purchase of residential real estate located at 1508 West 23rd Street, Jacksonville, Florida, JR Parker forged the signature of the seller of the residential real estate on an Agreement to Sell Real Estate contract.

33.     In or about May, 2004, in connection with the purchase of residential real estate located at 3238 Dillon Street, Jacksonville, Florida, conspirators obtained a mortgage loan from People's Choice Home Loan, Inc., Irvine, California, with a loan-to-value ratio of 90%, specifically, based upon a purported contract sales price of $70,000, the principal amount of the mortgage was $63,000.

34.     On or about July 2, 2004, in connection with the closing of residential real estate located at 1216 East 15th Street, Jacksonville, Florida, Dale A. Beardsley provided JR Parker with a check, in the amount of $9,647.25, drawn on the Real Estate Trust Account for Dale A. Beardsley, P.A., at First Guaranty Bank & Trust Company.

35.     On or about July 2, 2004, in connection with the closing of residential real estate located at 1216 East 15th Street, Jacksonville, Florida, JR Parker negotiated  a check, in the amount of $9,647.25, drawn on the Real Estate Trust Account for Dale A. Beardsley, P.A., at First Guaranty Bank & Trust Company at a Bank of America branch location in Jacksonville, Florida.

36.     On or about July 2, 2004, in connection with the closing of residential real estate located at 1216 East 15th Street, Jacksonville, Florida, JR Parker obtained a Bank of America Cashier's Check, number 2123596, in the amount of $9,647.25, which check fraudulently represented that the buyer of the said residential real estate was the source of said funds.

37.     On or about July 2, 2004, in connection with the closing of residential real estate located at 1138 East 15th Street, Jacksonville, Florida, Dale A. Beardsley provided JR Parker with a check, in the amount of $9,610.15, drawn on the Real Estate Trust Account for Dale A. Beardsley, P.A., at First Guaranty Bank & Trust Company.

38.     On or about July 2, 2004, in connection with the closing of residential real

estate located at 1138 East 15th Street, Jacksonville, Florida, JR Parker negotiated a

check, in the amount of $9,610.15, drawn on the Real Estate Trust Account for Dale A.

Beardsley, P.A., at First Guaranty Bank & Trust Company at a Bank of America branch

location in Jacksonville, Florida.

39.     On or about July 2, 2004, in connection with the closing of residential real

estate located at 1138 East 15th Street, Jacksonville, Florida, JR Parker obtained a

Bank of America Cashier's Check, number 2123597, in the amount of $9,610.15, which

check fraudulently represented that the buyer of the said residential real estate was the

source of said funds.

40.     On or about July 2, 2004, in connection with the closing of residential real

estate located at 1138 East 15th Street and 1216 East 15th Street, Jacksonville,

Florida, JR Parker brought Bank of America Cashier's Checks, number 2123596 for

$9,647.25, and number 2123597, in the amount of $9,610.15, to a closing held at the

law office of Dale A. Beardsley, in order to mislead People's Choice Home Loan, Inc.

into believing that the source of the down payment was the investor/borrower.

41.     In or about June, 2004, JR Parker paid $2,500 in cash to Tamera K.

Kinsman, HEIDI L. WEPPELMAN, and Nancy A. Nease, for successfully obtaining

mortgages on five (5) properties closed as part of JR Parker's real estate investment

"Program," said money being in addition to the fees and costs charged by the mortgage

company for originating and processing the mortgages on said five (5) properties.

42.     On or about July 7, 2004 , in an effort to conceal and continue their

conspiracy, JR Parker had a telephone conversation with Dale A. Beardsley, during

which JR Parker advised Beardsley that one of Beardsley's clients was publicly

disclosing the fact that Beardsley "fronts" the money for the clients' real estate

investor/borrower down payments, and that Beardsley should stop handling real estate

closings for that individual.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURES

1.      The allegations contained in Count One of this Information are hereby

realleged and incorporated by reference for the purpose of alleging forfeitures pursuant

to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28,

United States Code, Section 2461(c).

2.      From her engagement in the violations alleged in Count One of this

Information, punishable by imprisonment for more than one year, the defendant, HEIDI

L. WEPPELMAN, shall forfeit to the United States of America, pursuant to Title 18,

United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461(c), all of her interest in any property constituting or derived from proceeds

obtained directly or indirectly as a result of the said violations, including but not limited

to the following:

a.      A sum of money equal to $750,000.00 in United States currency, representing the amount of proceeds obtained as a result of the offense for which the defendant is jointly and severally liable with defendant Tamera K. Kinsman and Nancy A. Nease;

b.      All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 2932 Clairboro Road, Jacksonville, Duval County, Florida, Parcel Number 156024-0000;

c.      All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 2019 Barton Avenue, Jacksonville, Duval County, Florida, Parcel Number 065363-0000;

d.    2004 Ford Explorer, VIN 1FMZU63K24UC17412;

e.    1999 Ford F150 Pickup, VIN 1FTRX07L6XKB94955; and

f.    Approximately $11,500.00 in United States currency, in that such sum constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the offenses.

3.    If any of the property described above, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), including but not limited to the following:

a.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 2932 Clairboro Road, Jacksonville, Duval County, Florida, Parcel Number 156024-0000;

b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 2019 Barton Avenue, Jacksonville, Duval County, Florida, Parcel Number 065363-0000;

c.    2004 Ford Explorer, VIN 1FMZU63K24UC17412;

d.    1999 Ford F150 Pickup, VIN 1FTRX07L6XKB94955; and

e.    Approximately $11,500.00 in United States currency, in that such sum constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the offenses.

PAUL I. PEREZ
United States Attorney

By: _MARK B. DEVEREAUX_
MARK B. DEVEREAUX
Assistant United States Attorney

By: _Brian M. Kane_
BRIAN M. KANE
Assistant United States Attorney
Chief, Jacksonville Division